Ethel L. MOOTS, individually and on behalf of Diane L. Moots, her infant daughter, Appellant,

v.

SECRETARY, UNITED STATES DEPARTMENT OF HEALTH, EDUCATION AND WELFARE, SOCIAL SECURITY ADMINISTRATION, Appellee.

Mary A. Moots, Intervenor.

No. 9938.

United States Court of Appeals Fourth Circuit.

Argued June 30, 1965.

Decided Aug. 4, 1965.

Joseph Teck, Norfolk, Va. (Goldblatt & Lipkin, Norfolk, Va., on brief), for appellant.

James A. Oast, Jr., Asst. U. S. Atty. (C. V. Spratley, Jr., U. S. Atty., on brief), for appellee.

Before BRYAN and J. SPENCER BELL, Circuit Judges, and THOMSEN, District Judge.

## J. SPENCER BELL, Circuit Judge.

The question to be decided on this appeal is whether Ethel L. Moots and her young daughter, Diane Lee Moots, are entitled to receive benefits under the Social Security Act, 42 U.S.C.A. § 402, as the widow and dependent child of Clarence Moots. Ethel's right to the widow's benefits is disputed by Mary Moots, who claims herself to be Clarence's widow. After lengthy administrative proceedings, the Secretary's representatives, on June 14, 1963, made final a decision denying the benefits Ethel and Diane had claimed. A complaint was then filed by the claimants in the district court to review the administrative determinations adverse to them, and on February 9, 1965, the district court entered judgment in favor of the Secretary. This appeal followed.

Although the facts in this case are extensive, a brief summary of them will suffice for the purpose of this appeal. Clarence Moots was born on April 16, 1885, and died domiciled in Michigan on July 16, 1956. In the meantime, however, he lived with a number of women, the first of whom was Annie Mary Burkhiemer (the present Mary Moots), to whom he was ceremonially married in Ohio on April 23, 1905. Clarence and Mary lived together until about 1920, when Clarence left Mary and began living with one Rose Blake. Some of the six or seven children born of the marriage between Clarence and Mary lived with their father after he and their mother separated, and some of them stayed on with her. Rose died not long after she and Clarence began living together, whereupon Clarence shared his home with one Jessie McKay until her death in January, 1953. The district court observed that there could be no doubt that Mary was aware of Clarence's several romances, but she appears not to have protested his conduct,[1] even when Clarence, after Jessie McKay's death, took unto himself Ethel sometime in 1953, an association which resulted in the birth of a daughter, Diane, in either July or August of 1954. The first sign of any renewal of interest by Mary in Clarence came in January, 1959, when she inquired of the Social Security Administration whether she was entitled to receive any payments under the Act because her ceremonial marriage with Clarence in 1905 had, according to her representation, never been terminated. A formal application for widow's benefits was filed by Mary in May, 1960, and this prompted a suspension of the payments which the present claimants had been receiving as Clarence's common law wife and legitimate child since his death.

Mary's application resulted in two different hearings before examiners in an effort to decide which woman was

---

1. Mary claims to have made one unsuccessful effort to secure some financial support from Clarence after he and she separated and he began living with Rose Blake. Thereafter she states that she "never bothered with Clarence * * *. I just wasn't interested in him at that time."

entitled to the benefits in issue. Mary testified that she had never instituted divorce or annulment proceedings against Clarence and that she was not aware that any court had ever granted him a divorce from her. Ethel testified that Clarence had told her that he and Mary had been divorced, but a diligent search of the records in all the places where either Clarence or Mary had ever lived failed to produce any evidence to support Clarence's representation. Because of this fact and because Clarence had made other conflicting statements from time to time about the termination of his marital relationship with Mary, the hearing examiner found that Clarence's marriage to Mary had never been terminated by divorce or annulment. Like the district court, we think that conclusion is well supported by the evidence of record.

Convinced that the ceremonial marriage between Clarence and Mary had never been terminated, the hearing examiner concluded that it was a legal impediment which prevented the existence of a valid marriage between Clarence and Ethel.[2] It is this key conclusion which counsel for the claimants vigorously disputes on this appeal. Ethel's basic position is that even conceding that Clarence and Mary may never have been divorced, this alone, under the law of Michigan,[3] would not make a subsequent valid marital relationship impossible. In support of this assertion, Ethel relies heavily upon the rule recognized by the Michigan courts that the presumption favoring the validity of a subsequent marriage overrides the presumption favoring the continuance of a prior marriage. See, e. g., In re Adams' Estate, 362 Mich. 624, 107 N.W.2d 764, 765, 767 (1961); Doertch v. Folwell Engineering Co., 252 Mich. 76, 233 N.W. 211, 212 (1930). See generally 14 A.L.R.2d 7, 10, 37–38 (1950). It is her contention that she and Clarence were ceremonially married on April 23, 1953, by a justice of the peace in Detroit, Michigan. The hearing examiner dealt at length with this claim, and it was his conclusion that the "overwhelming weight of the evidence" was to the effect that there never had been a ceremonial marriage between Clarence and Ethel. The evidence of record amply supports this factual finding, and thus it is binding upon us.

Nevertheless, Ethel argues, even if the relationship between Clarence and her was only a common law marriage, this is not a valid basis for refusing to hold here that her marriage could be legal and valid even in the face of a prior unterminated ceremonial marriage. The decision in In re Adams' Estate, supra, is the strongest authority supporting Ethel's position which has been called to our attention. While we can readily agree that there are certain factual similarities between the Adams case and this one, we note that this case is factually dissimilar to Adams in certain key respects.

First, the second marriage in Adams was a ceremonial marriage rather than the common law marriage we have in this case, and, as the district judge observed, the Adams opinion itself seems to suggest that the presumption of the validity of a second ceremonial marriage is entitled to greater weight than when the later marriage is a common law one.[4] Secondly, the evidence in this case that the marriage between Clarence and Mary was never dissolved by divorce is considerably more extensive than the evi-

2. Accordingly, the examiner ruled that Mary Moots was entitled to the widow's benefits, and the Appeals Council affirmed this determination. Benefits were denied Diane Moots on the theory that her rights depended upon the success of her mother's claim.

3. It is conceded by all that since Clarence died domiciled in Michigan, Michigan law governs the resolution of the present controversy.

4. See also, on this point language in the Doertch case, 233 N.W. at 212. But see May v. Meade, 236 Mich. 109, 210 N.W. 305, 307 (1926), quoting with approval from Howard v. Kelly, 111 Miss. 285, 71 So. 391 (1916).

dence in the Adams opinion pertaining to the termination of the first marriage. Thirdly, the evidence in this case indicates that even if she saw Clarence only briefly after they separated, Mary was aware of his whereabouts through their children and knew of at least some of his activities. Nothing in the Adams opinion indicates to us that this same continuing contact between the parties to the first marriage was present there. In short, we think Adams was decided on its own facts, and since the facts in this case are somewhat different, we decline to treat Adams as dispositive of the result here. We are of the opinion that the law of Michigan was properly applied in this controversy, and we have no choice but to affirm the prior decisions denying Ethel the widow's benefits.[5]

■■ There remains the question of whether despite the fact that her mother has been held not to be entitled to benefits, Diane Moots can come within the statutory definition of a dependent child. A crucial inquiry, insofar as Diane is concerned, is whether the Michigan courts would hold that she would be entitled to take intestate personal property from Clarence, since that is the standard provided in 42 U.S.C.A. § 416 (h) (2) (A) for determining whether an applicant is the child of a wage earner. However, both the hearing examiner and the district judge ruled adversely to Diane on this point because an illegitimate child cannot, under Michigan law, inherit intestate personal property from its father unless there has been an acknowledgment of the child by the parents in accordance with a Michigan statute.[6] The required acknowledgment does not appear in the present record. Nor can Diane be deemed to be Clarence's child, for Social Security benefit purposes, under § 416(h) (2) (B) [7] because that subparagraph requires the mother and father in good faith to have gone through a marriage ceremony which but for the existence of a legal impediment would have resulted in a valid marriage. The examiner's finding that no marriage ceremony was performed uniting Clarence and Ethel thus forecloses their daughter from qualifying for benefits. Since Diane is unable to bring herself within any of the provisions defining "child," the denial of benefits to her must regrettably be affirmed.

No error having been committed by the district court, the judgment below is affirmed.

Affirmed.

---

5. Nor do we think that the other statutory provisions cited by Ethel's counsel strengthen her case. 42 U.S.C.A. § 416 (h) (1) (A) provides that one shall be deemed to be the widow of an insured individual (even if not validly married to him) if the courts of the relevant state, for purposes of determining the devolution of his intestate personal property, would treat this person as if she were the wage earner's widow. In our judgment the Michigan courts would hold that because of the prior unterminated marriage, Mary, not Ethel, would be entitled to Clarence's intestate personal property. 42 U.S.C.A. § 416(h) (1) (B) provides that where an individual who is not (and is not deemed to be) the wage earner's widow establishes to the satisfaction of the Secretary that she in good faith went through a marriage ceremony with the wage earner which, except for the existence of a legal impediment unknown to her, would have resulted in a valid marriage, that individual shall be deemed to have contracted a valid marriage. However, the examiner here, on substantial evidence, has found that Clarence and Ethel did not participate in a marriage ceremony. Moreover, § 416(h) (1) (B) is, inapplicable when, as here, another person (Mary) has qualified for widow's benefits under certain other designated sections of the Act.

For a more extensive discussion of the two sections mentioned above, see Comment, Effect of State Marital Laws on "Widow's" Benefits Under the Social Security Act, 1 San Diego L.Rev. 76 (1964)

6. Mich.Stat.Ann. § 27.3178(153) (1962).

7. Thus the language in 42 U.S.C.A. § 402 (d) (3) stressed so by Diane's counsel in his oral argument before us is not applicable to her.